AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

**LODGED**
CLERK, U.S. DISTRICT COURT

2/19/2026

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ KM _____ DEPUTY

# UNITED STATES DISTRICT COURT

**FILED**
CLERK, U.S. DISTRICT COURT

2/19/26

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ cv _____ DEPUTY

for the

Central District of California

| | |
|---|---|
| United States of America | |
| v. | Case No. 2:26-mj-00937-DUTY |
| Gevorg Gevorgyan, | |
| Defendant. | |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, Jay J. Kim, the complainant in this case, state that the following is true to the best of my knowledge and belief.  On or about the date of February 17, 2026, in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 545 | Smuggling Goods into the United States |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/ Jay J. Kim*
*Complainant's signature*

_____
Jay J. Kim, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    2/19/26                    _____
                                    *Judge's signature*

City and state:    Los Angeles, California        Hon. Margo A. Rocconi, U.S. Magistrate Judge
                                                  *Printed name and title*

AUSA: Christina R.B. López x2475

## AFFIDAVIT

I, Jay J. Kim, being duly sworn, declare and state as follows:

### I.    INTRODUCTION

1.    I am a Special Agent ("SA") with Homeland Security Investigations ("HSI") and have been so employed since June 2025. I am currently assigned to the Field Training Program at the Los Angeles International Airport ("LAX") and have been assigned to that office since February 2026.  My responsibilities include the investigation of federal criminal laws, including crimes involving narcotics importation and smuggling, contraband importation and smuggling, smuggling or importation of counterfeit goods, intellectual property rights violations, and human trafficking.

2.    I have completed the Criminal Investigator Training at the Federal Law Enforcement Training Center in Glynco, Georgia, which included approximately 450 hours of instruction, including classes involving the study of constitutional law, search and seizure, surveillance, contraband investigations, and other program areas for which federal law enforcement officers bear responsibilities.

3.    I have also completed the Special Agent Training at the Federal Law Enforcement Training Center in Charleston, South Carolina, which included approximately 350 hours of training in the investigations of crimes within the program areas for which HSI bears responsibility.

## II.    **PURPOSE OF AFFIDAVIT**

4.    This affidavit is made in support of a criminal complaint against Gevorg GEVORGYAN ("GEVORGYAN") for a violation of 18 U.S.C. § 545 (Smuggling Goods into the United States) (the "SUBJECT OFFENSE").  This affidavit is also made in support of a search warrant for GEVORGYAN's cell phone, namely, one Apple iPhone with a black phone case, identified as belonging to GEVORGYAN and seized from GEVORGYAN's wife on February 17, 2026 (the "SUBJECT DEVICE"), as described in Attachment A, for the items to be seized described in Attachment B.  Attachments A and B are incorporated herein by reference.

5.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, all amounts or sums are approximate, and all dates and times are on or about those indicated.

## III.    **SUMMARY OF PROBABLE CAUSE**

6.    On February 17, 2026, U.S. Customs and Border Protection ("CBP") notified HSI that approximately 1,121 cartons of foreign cigarettes were found in GEVORGYAN's and his wife's checked luggage at LAX.  GEVORGYAN and his wife, Lilit Gevorgyan

("Lilit") had arrived at LAX from Warsaw, Poland, and did not declare or report the cigarettes for invoicing as required by United States Customs law.

## IV.   STATEMENT OF PROBABLE CAUSE

7.    Based on my review of law enforcement reports, my conversations with other law enforcement officers, and my own knowledge of the investigation, I am aware of the following:

**A.    GEVORGYAN Arrives at LAX with 1,121 Cartons of Undeclared Foreign Cigarettes in his Suitcases**

8.    According to flight records that I have reviewed, GEVORGYAN, a citizen of Armenia, departed Warsaw Frederic Chopin Airport ("WAW") onboard LOT Polish Airlines flight 21 and arrived at LAX on February 17, 2026, at approximately 2:16 p.m. Additional flight records revealed that GEVORGYAN traveled to WAW from Zvartnots International Airport ("EVN") in Zvartnots, Armenia via LOT Polish Airlines flight 728.

9.    According to CBP agents that I have spoken with, after retrieving the luggage from the baggage claim area and entering the LAX customs area, CPB referred GEVORGYAN to the baggage control secondary inspection area for further examination due to the number of suitcases GEVORGYAN and his wife had with them, namely, eight checked bags and two carry-on items.

10. According to the CBP agents, GEVORGYAN claimed ownership of the luggage during the secondary inspection. Additionally, the checked luggage bore the name "GEVORGYAN" on the luggage tags affixed to the suitcases.

11.    During the examination in the secondary inspection
area, CBP officers searched GEVORGYAN's checked suitcases.
Based on my review of reports, photographs, and conversations
with the officers, I know that CBP officers found approximately
1,121 cartons of cigarettes spread between the eight checked
suitcases belonging to GEVORGYAN, as pictured below:

 

12.    CBP officers further examined the cigarette cartons'
packaging and identified the cigarettes as foreign cigarettes.
CBP officers explained the restrictions against importing
foreign cigarettes to GEVORGYAN, including against importing
cigarettes that lack the United States Surgeon General's warning
on the cigarette packaging (like those in GEVORGYAN's
suitcases).

13.    Based on my review of a Customs Declaration Form (CBP
Form 6059B) signed by GEVORGYAN and provided to me by CBP,
GEVORGYAN only declared one carton of cigarettes and listed the
approximate value as $25.

14.   At approximately 4:42 p.m., CBP officers seized the foreign cigarettes.  CBP officers estimate the value of the foreign cigarettes in GEVORGYAN's suitcases to be approximately $100,000.

**B.   GEVORGYAN and His Wife Give Mirandized Statements**

15.   At approximately 5:50 p.m., CBP officers contacted me regarding the seizure of the cigarettes, and I responded to the scene with HSI SAs Steven Low and Dawson Reeder at approximately 6:30 p.m.

16.   At approximately 7:18 p.m., a CBP officer, SA Low, and I conducted an audio-recorded interview of GEVORGYAN.  The CBP officer was present during the interview to offer Armenian to English translation services.

17.   I read GEVORGYAN his Miranda rights in English and the CBP officer translated the rights to Armenian.  GEVORGYAN agreed to speak with me.  GEVORGYAN told me that he came to the United States with his wife to relax.  GEVORGYAN stated he had distant relatives staying in Glendale whom they would visit.  GEVORGYAN told me that he and his wife traveled to the United States with two carry-on pieces of luggage and had brought one carton of cigarettes, which he declared to Customs, to give as gifts.

18.   GEVORGYAN stated that prior to departing from EVN in Armenia, he was approached by an unknown individual at the airport.  The unknown individual asked GEVORGYAN if he was willing to take eight suitcases with him to the United States. GEVORGYAN said that the unknown individual told him that, upon

clearing Customs in the United States, there would be another individual who would be able to identify the suitcases GEVORGYAN was escorting, to whom he could then pass them off.

19.  GEVORGYAN stated that the unknown individual gave four suitcases to him and four suitcases to his wife.  GEVORGYAN stated that his personal belongings, including the declared cigarette carton, were only in the two carry-on bags.

20.  GEVORGYAN told us that he was willing to escort the eight suitcases out of "compassion" and did not receive any compensation for doing so.  GEVORGYAN further explained that he did not see the suitcases until they arrived at LAX.  According to GEVORGYAN, the unknown individual said all eight suitcases were identical and would be easily identifiable when GEVORGYAN arrived at LAX.  GEVORGYAN claimed that he could not remember what the unknown subject looked like and described him as a "normal looking" person.

21.  At approximately 8:49 p.m., a CBP officer, SA Low, and I conducted an audio-recorded interview of Lilit, GEVORGYAN's wife.  The CBP officer was present during the interview to offer Armenian to English translation services.

22.  Lilit was read her Miranda rights in English and the CBP officer translated the rights to Armenian.  Lilit agreed to speak with us.  Lilit stated that she came to the United States for a 10-day vacation, and that she and GEVORGYAN would be staying at her husband's friend's place in Glendale, California.

23.  When I asked Lilit what happened at the airport in Armenia, she told me that the airport culture is different in

Armenia and that people are allowed much further into the airport compared to the United States.  Because of this, Lilit said that she and GEVORGYAN got to the airport early.  Lilit stated that upon reaching a checkpoint, GEVORGYAN was approached by an unknown individual.  Lilit stated that she does not know what the unknown individual looks like and did not listen to the conversation between the unknown individual and GEVORGYAN. Lilit stated that it was part of Armenian culture to send things via other travelers and because of this, GEVORGYAN accepted the unknown individual's request to take eight suitcases to the United States out of "compassion."

24.  Lilit told us that she was unaware of the cartons of cigarettes inside the suitcases and the name "GEVORGYAN" being on the suitcases.  Lilit identified a phone in her purse, i.e., the SUJBECT DEVICE, as belonging to GEVORGYAN.

### V.  <u>TRAINING AND EXPERIENCE ON CONTRABAND SMUGGLING</u>

25.  Based on my training with investigations into contraband smuggling and conversations with other law enforcement officers about the same, I know the following:

a.  Contraband smuggling is a business that involves numerous co-conspirators, from lower-level suppliers to higher-level suppliers, as well as associates to process, package, and deliver the contraband and launder the contraband proceeds. Contraband traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with

co-conspirators, conduct contraband transactions, and transport contraband or contraband proceeds.

      b.    Contraband smugglers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of contraband.  The aforementioned records are often maintained where the contraband smuggler has ready access to them, such as on their cell phones and other digital devices.

      c.    Communications between people buying and selling contraband take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the contraband between the seller and the buyer, and the negotiation of price.

      d.    Contraband smugglers often keep the names, addresses, and telephone numbers of their contraband smuggling associates on their digital devices.  Contraband smugglers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

## VI.    TRAINING AND EXPERIENCE ON DIGITAL DEVICES

26.    As used herein, the term "digital device" includes the SUBJECT DEVICE.

27.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and

who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

d.  Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

28.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it can take a substantial period of time to search a
digital device for many reasons, including the following:

e.  Digital data are particularly vulnerable to
inadvertent or intentional modification or destruction.  Thus,
often a controlled environment with specially trained personnel
may be necessary to maintain the integrity of and to conduct a
complete and accurate analysis of data on digital devices, which
may take substantial time, particularly as to the categories of
electronic evidence referenced above.

f.  Digital devices capable of storing multiple
gigabytes are now commonplace.  As an example of the amount of
data this equates to, one gigabyte can store close to 19,000
average file size (300kb) Word documents, or 614 photos with an
average size of 1.5MB.

29.    Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII.    **CONCLUSION**

30.    For all the reasons described above, there is probable cause to believe that GEVORGYAN violated the SUBJECT OFFENSE.

31.    Further, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offense will be found in the SUBJECT DEVICE, as described in Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this ___ day of
February 19, 2026.

_____
HONORABLE MARGO A. ROCCONI
UNITED STATES MAGISTRATE JUDGE